IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 15, 2023

**STEPHEN D. DEMPS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Putnam County**
**No. 2014-CR-436      Gary McKenzie, Judge**

_____

**No. M2022-01429-CCA-R3-PC**
_____

A Putnam County jury convicted the Petitioner, Stephen D. Demps, of four counts of aggravated sexual battery and five counts of rape of a child. The trial court sentenced him to twenty-five years of incarceration. The Petitioner appealed his convictions to this court, and we affirmed the judgments. *State v. Demps*, No. M2017-00641-CCA-R3-CD, 2018 Tenn. Crim. App. LEXIS 156, at *1 (Tenn. Crim. App. Feb. 27, 2018), *no perm. app. filed*. Subsequently, the Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel, that law enforcement altered evidence, and that the State committed prosecutorial misconduct. The post-conviction court denied the petition after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Gordon A. Byars, Cookeville, Tennessee, for the appellant, Stephen D. Demps.

Jonathan Skrmetti, Attorney General and Reporter; Jonathan H. Wardle, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Beth E. Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Background**

This case arises from the Petitioner's sexual abuse of the victim, a twelve-year-old girl and the Petitioner's great-niece. For this conduct, a Putnam County grand jury indicted the Petitioner with five counts of rape of a child and five counts of aggravated sexual battery. *Demps*, 2018 Tenn. Crim. App. LEXIS 156, at *1.

# A. Trial

The following is this court's summary on direct appeal of the facts presented at pretrial hearings and the Petitioner's trial:

Detective Roger Cooper testified that he had worked for the Putman County Sheriff's Department ("PCSD") for over seventeen years. In December 2013, Detective Cooper investigated [the victim's] complaint against the [the Petitioner], [the victim's] great-uncle. On December 20, 2013, Detective Cooper called the [Petitioner] and asked him to come to the PCSD for an interview ("the December interview"). The next day, the [Petitioner] and his wife, [], came to the PCSD to speak with Detective Cooper. Detective Cooper did not inform the [Petitioner] of [the victim's] allegations prior to the interview. Detective Cooper stated that, during the December interview, the [Petitioner] "didn't admit to what was being alleged, but did talk about some inappropriate contact." Detective Cooper made a video recording of the December interview. Detective Cooper did not tell the [Petitioner] that he was under arrest or that he could not leave the PCSD, and the [Petitioner] left at the end of the December interview. On January 14, 2014, Detective Cooper went to the [Petitioner's] residence to interview the [Petitioner] again ("the January interview"). Detective Cooper did not alert the [Petitioner] or [his wife] that he was coming to interview the [Petitioner]. [The Petitioner's wife] invited Detective Cooper to come inside the residence after he knocked on the door and introduced himself. Detective Cooper made an audio recording of the January interview with the [Petitioner].

On cross-examination, Detective Cooper testified that, during the December interview, the [Petitioner] stated that [the victim] had pushed up against him and that "he had pinched her on the boob to get her off of him . . . when they would wrestle around." Detective Cooper did not recall whether he informed the [Petitioner] that he recorded the December interview, but he stated that the video camera was visible in the corner of the interview room. Detective Cooper did not inform the [Petitioner] of his *Miranda* rights at the December interview because the [Petitioner] was not under arrest.

Detective Cooper stated that he went to the [Petitioner's] house in January to photograph the [Petitioner's] basement, where [the victim] alleged the incidents had occurred. He agreed that his investigation was focused on the [Petitioner] based on [the victim's] allegations. Regarding the January interview, Detective Cooper stated that the [Petitioner] was friendly and answered his questions. He stated that, if the [Petitioner] had asked him to leave the residence, he would have left. Detective Cooper explained that,

2

while he was in the [Petitioner's] basement, the [Petitioner] voluntarily allowed him to look at the [Petitioner's] computer files and search history. Detective Cooper agreed that he mentioned religion to the [Petitioner] during the January interview, but he denied that he used the theme of religion to coerce a confession from the [Petitioner]. He explained that, after he observed that the [Petitioner's] basement was unfinished and did not look like an area where [the victim] would have been wrestling with the [Petitioner], he asked the [Petitioner] more questions. Detective Cooper agreed that he told the [Petitioner] to do the "right thing" and discussed sexual urges with the [Petitioner].

. . . .

Detective Cooper testified that, in 2010, he became a detective for the PCSD in the Crimes Against Children Division. He explained that he worked with the Child Advocacy Center ("CAC") in Cookeville. Detective Cooper stated that [the victim], her mother, and a family friend came to the PCSD on December 14, 2013, and filed a report; [the victim] was twelve years old at the time. [The victim] was interviewed at the CAC, and Detective Cooper observed this interview from another room. He then asked the [Petitioner] to come to the PCSD for the December interview. The [Petitioner] and [his wife] came to the PCSD on December 20, 2013, and Detective Cooper interviewed the [Petitioner]. Detective Cooper went to the [Petitioner's] residence on January 14, 2014 to conduct a second interview. According to Detective Cooper, the [Petitioner] demonstrated his sexual contact with [the victim] in the basement during the second interview. Detective Cooper then asked the [Petitioner] if he had penetrated [the victim's] vagina with his tongue. Detective Cooper explained that, based on his years of experience, he knew that the [Petitioner] was withholding information by not responding to or denying the allegation. Detective Cooper stated that the [Petitioner] "had a look on his face of, like he was going to say something[,]" so Detective Cooper said that the [Petitioner's] expression implied that the [Petitioner's] answer was yes. Detective Cooper also asked the [Petitioner] if he kissed [the victim's] vagina, and the [Petitioner] nodded in the affirmative.

On cross-examination, Detective Cooper stated that, during her interview at the CAC, [the victim] said that the [Petitioner] touched her over her clothes. He explained that he never personally interviewed [the victim], but he spoke with [the victim's] mother, [], about the allegations. Detective Cooper agreed that, after the [Petitioner] admitted he had sexual contact with [the victim], Detective Cooper asked the [Petitioner] if he felt guilty. Detective Cooper stated that the [Petitioner] seemed remorseful and said he

3

was ashamed of his conduct but also deflected blame.

[The victim] testified that, in December 2013, she was twelve years old. She stated that she spent time at the [Petitioner's] residence, including spending the night. [The victim] said that her siblings also went to the [Petitioner's] residence, but she explained that sometimes she went by herself. The [Petitioner] and [his wife] also transported [the victim] to and from school on occasion. She explained that she liked to watch videos of hair and makeup tutorials on the computers in the [Petitioner's] basement. [The victim] stated that the [Petitioner] began touching her vagina with his fingers and mouth in the basement of his residence when she was eight years old. The [Petitioner] told her not to tell anyone about the touching. [The victim] explained that the [Petitioner] put his fingers and tongue inside her vagina and moved them around. She stated that she generally wore shorts and a T-shirt when the [Petitioner] penetrated her. She explained that she would be sitting at the computer, and the [Petitioner] would sit next to her and touch her. [The victim] stated that the [Petitioner] took off her shorts or made her stand in order to penetrate her. She also stated that the [Petitioner] put his hand up her shirt and touched her breasts.

[The victim] described an incident that occurred in the living room of the [Petitioner's] residence. She was sitting on the couch watching TV, and the [Petitioner] penetrated her vagina with his fingers and tongue. [The victim] testified regarding another incident that occurred after the [Petitioner] and [his wife] went to dinner with [the victim] and her siblings at a Golden Corral restaurant. Earlier that day, [the victim] was in the basement of the [Petitioner's] residence with the [Petitioner]. [The victim] stated that the [Petitioner] penetrated her vagina with his fingers and tongue. [The victim] stated that, on the last occasion that her mother arranged for [the victim] to spend the night at the [Petitioner's] residence, she cried and told her mother that she did not want to go. She testified that the [Petitioner] penetrated her on this occasion with his fingers and tongue. [The victim] estimated that the [Petitioner] penetrated her with his fingers and tongue at least thirty times.

[The victim] stated that, while the [Petitioner] was committing the offenses, her siblings were usually in the upstairs of the residence, and [his wife] was either upstairs or not in the residence. [The victim] stated that she told her neighbor, [], about the [Petitioner's] conduct, and [the victim] then told her mother. She explained that she did not inform an adult of the abuse until she told [her neighbor] because she was scared and embarrassed. After [the victim] informed her mother of the [Petitioner's] offenses, [the victim] and her mother went to the PCSD and spoke with a deputy. Later, [the victim] spoke with a woman at the CAC. [The victim] admitted that she did

4

not tell the woman at the CAC all the facts about the [Petitioner's] offenses; [the victim] told the woman that the [Petitioner] had touched her on the outside of her clothing because she was embarrassed and believed that she would get into trouble.

*Demps*, at \*7-12. Based on this evidence, the jury convicted the Petitioner of five counts of rape of a child and four counts of aggravated sexual battery. The trial court merged counts six and eight, aggravated sexual battery, into counts two and four, rape of a child. The Petitioner received a total effective sentence of twenty-five years of incarceration. *Id*.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel, that police had altered the audio recording of his interview before it was played at trial, and that the prosecutor helped the victim lie during her testimony.

The following evidence was presented at a hearing on the petition: The Petitioner testified that Detective Cooper came to his residence in 2014 and asked to look at the Petitioner's basement. He asked the Petitioner about the three computers in the basement and whether he used them to look at pornography, which the Petitioner denied doing. The Petitioner was not aware that Detective Cooper was recording their conversation. Thereafter, the Petitioner was indicted and posted bond. His bondsman recommended that he get a lawyer and directed him to a lawyer whom he would eventually hire ("Counsel"). Approximately two weeks after the Petitioner hired Counsel, Counsel came to him with an offer from the State to plead guilty in exchange for an eight-year sentence to be served at thirty-five percent. At this time, the Petitioner was charged only with aggravated sexual battery. The Petitioner rejected the offer, and Counsel returned again with information that the State planned to charge him with rape of a child as well. Counsel explained that he had exposure to a longer sentence for a rape of a child conviction and advised the Petitioner to accept the plea offer.

The Petitioner had wanted a sentence shorter than eight years and Counsel told him the trial court might sentence him to less than eight years but that also he could "die in prison." The Petitioner did not understand the elements of aggravated sexual battery. Counsel filed a motion for a bill of particulars. The two men met three or four times and Counsel gave the Petitioner a copy of the recording of his statement to Detective Cooper, but the Petitioner did not listen to it prior to trial. The Petitioner noted that he had a hearing issue and could not hear everything that happened at his trial, meaning he had to trust Counsel. The Petitioner agreed that, had he listened to the recording prior to trial, he would have changed his mind about accepting the plea.

The Petitioner recalled how, in the recorded statement, he "came clean" with

Detective Cooper because he felt that "nothing was going to really happen." The Petitioner told Detective Cooper that he had touched the victim's vagina but that "she wanted to do it." Detective Cooper asked him to elaborate and the Petitioner described touching the Petitioner's vagina in detail, including with his tongue. When asked about penetration of the vagina, the Petitioner told the detective several times that he never penetrated the victim but touched the outside and top of her vagina. Ultimately, this recording was in the discovery file provided to Counsel and when it was played at trial, the Petitioner discovered that much of the recording had been deleted. If the Petitioner had heard it prior to trial, it would have changed his position on the plea offer. The Petitioner said that Counsel should have kept the recording out of the trial because it was hearsay. The Petitioner recalled that he never sat down with Counsel and discussed his case in detail and did not know he was being tried for the rape of a child charges as well as the aggravated sexual battery charges. The Petitioner hoped he was facing no more than two years in prison, based on his "rubbing" the victim but not raping her.

The Petitioner testified that Counsel did not explain to him the release eligibility on his plea offer and that it meant he would be eligible to be released after two or three years of incarceration. This would have influenced the Petitioner's decision with regard to the plea. The Petitioner said that, because he could not hear the victim's testimony, he was unable to advise Counsel during trial what to ask the victim about. The Petitioner was unaware whether Counsel made his hearing impairment known to the trial court.

The Petitioner stated that Counsel should have advocated more on the issues of the lack of a search warrant for the Petitioner's computer, as well as the superseding indictment charging him with the additional counts of rape of a child.

On cross-examination, the Petitioner stated that he was represented by Counsel and a second attorney ("Co-counsel"). The Petitioner stated that he wanted a one- to two-year sentence, rather than the offered eight-year sentence, because he was not guilty of aggravated sexual battery. He said that the "only" aggravated thing about the crime was that the victim was under thirteen years of age. The Petitioner reiterated that he did not understand how he could be charged with rape and took issue with the superseding indictment for rape of a child and its timing. He thought the jury could not find him guilty of rape.

The Petitioner reiterated that Counsel provided him the recording of his statement before trial but he lost it and never listened to it. He conceded that he did not tell Counsel or Co-counsel that he could not hear the trial proceedings. When asked about his confession on the recording, the Petitioner stated he had never said those things.

Counsel testified that he met with the Petitioner several times before being retained by him. At that point, the Petitioner had been indicted and was released on bond. Counsel had been practicing for forty-five years and had tried thirty cases before a jury. Counsel

6

described the prosecutor on the Petitioner's case as "very difficult to deal with" and stated that he was determined to convict the Petitioner. The State extended the eight-year offer early on in Counsel's representation, which Counsel forwarded to the Petitioner, along with his discovery file. Counsel and the Petitioner had a meeting to discuss the charges. The Petitioner never indicated that he could not hear. Co-counsel was present at their meeting and Counsel indicated that their meeting was recorded. Counsel explained the law surrounding aggravated sexual battery and played the recording of his statement to Detective Cooper. Counsel recalled that he and Co-counsel explained the release eligibility portion of the State's offer to the Petitioner. Counsel understood that the State would pursue more charges if the Petitioner did not accept the initial offer and explained the same to the Petitioner. Co-counsel read the aggravated sexual battery and rape of a child laws to the Petitioner.

Counsel recalled telling the Petitioner that if he took the plea offer, he would be able to return home in the foreseeable future. He also said that a jury would probably want to put the Petitioner in prison for life. The problem was the Petitioner's belief that he did not rape the victim because he believed that penetration had not occurred. Counsel said he could not get through to the Petitioner that a child victim is a protected class legally and that if he proceeded to trial and she testified, he would likely be convicted. Counsel continuously considered whether the Petitioner should testify and decided it would not be in his best interest, particularly because of how Counsel felt the Petitioner would perform on cross-examination. Counsel felt that the evidence was very strong and that the Petitioner's only chance of success would be in securing a conviction for a lesser-included offense.

Counsel hired an investigator who interviewed the Petitioner. Counsel also arranged for the Petitioner to undergo a psychosexual evaluation. Counsel filed pre-trial motions to exclude the Petitioner's confession and a motion for a bill of particulars. Counsel did not place any credence, based on his experience, that the Petitioner's confession had been altered, and he stated that the Petitioner had in fact listened to the tape prior to trial. Counsel stated that he did not shy away from taking cases to trial but that the Petitioner made a bad decision when he turned down the eight-year offer.

Counsel recalled that there was an issue with witness sequestration during the trial that was brought to the trial court's attention, who admonished the witnesses that they were not to violate the order of sequestration. Counsel motioned for a mistrial and the trial court responded that Counsel could explore any influence on the witnesses' testimony during cross-examination. Counsel recalled that the victim gave inconsistent testimony but that he had to question her very delicately in front of the jury. He recalled that the victim admitted on the stand that she was testifying inconsistently.

Co-counsel testified that he assisted Counsel in preparing for the Petitioner's trial. He recalled the Petitioner's misconception about rape requiring full penetration, which Co-

counsel made "abundantly clear" to him was not the case. Co-counsel logged eleven in-person meetings with the Petitioner. The investigator testified that he interviewed the Petitioner, who told him "word for word" what he had said to the police, and the investigator felt that Counsel would find it impossible to defend the Petitioner in a jury trial.

Following the close of the hearing, the post-conviction court issued an order denying the Petitioner relief and stating the following:

> [Counsel] and [Co-counsel] both testified that the Petitioner was properly advised o[f] what the legal consequences of accepting the plea offer would be and the legal consequences of rejecting it. [Counsel] and [Co-counsel] also testified that they explained to [the Petitioner] what he was charged with and what the proper penalty would be i[f] convicted. The only proof at the hearing of any lack of proper legal advice given to [the Petitioner], comes only from [the Petitioner]. After considering all the testimony, this Court credits the testimony of [Counsel], [Co-counsel], and [the investigator] over that of [the Petitioner.] It is hard to reconcile the complete testimony of [Counsel], [Co-counsel], and [the investigator] with that of [the Petitioner.] This Court also finds that any further conflict between the testimony of [the Petitioner] and other said witnesses, will be decided in favor of [Counsel], [Co-counsel], and [the investigator].

> For the reason listed above, the Petitioner has failed to carry his burden of clear and convincing evidence to establish this issue.

> [Counsel] testified that he did ask the victim on cross-exam[ination] if she had violated the rules of sequestration during the trial. [Counsel] explained that the victim testified that she did not violate said rule. It is unclear what the Petitioner believes [Counsel] should have done to "fully cross-examine" the victim. The Petitioner offered no evidence at this hearing as to what further questions of the victim, or any other witness, related to sequestration violations would have brought to bear. [Counsel] explained his tactics and strategy in relation to the cross-examination of the victim in this case. This Court finds that [Counsel's] performance, in relation to this issue, did not fall below an objective standard of reasonableness under prevailing professional norms. Alternately, even if such a departure from prevailing professional norms existed in [Counsel's] performance, the [P]etitioner has failed to show that this departure would have resulted in a reasonable probability of a different result at trial.

> For the reason listed above, the Petitioner has failed to carry his burden of clear and convincing evidence to establish this issue.

8

[Counsel] testified to filing approximately fifty (50) motions in the Petitioner's case, including a motion to suppress his confession. . . . . The Petitioner offered no evidence of any specific motion to suppress that should have been filed in his case. Further, the Petitioner has offered no evidence that any other motion filings would have possibly changed the outcome of his case.

For the reason listed above, the Petitioner has failed to carry his burden of clear and convincing evidence to establish this issue.

[Counsel] testified that he listened to the audio tape of the Petitioner's confession and did not believe it was altered in any way. During the Petitioner's testimony, it was unclear what if anything he was alleging was altered about said audio tape. The Petitioner failed to present any evidence that would tend to establish the audio confession was altered.

The evidence presented at this hearing established that [Counsel] met with the Petitioner on multiple occasions to discuss his defense. [Counsel] took time to go over the discovery and the State's evidence with the Petitioner. [Counsel] fully explained what the plea offer was and what was at risk if the Petitioner took his case to trial. [Counsel] also hired a criminal investigator to assist in preparing a defense for the Petitioner. The Petitioner presented absolutely zero evidence to establish any allegations made in the written petitions or any allegation testified to at this hearing. In the face of overwhelming evidence the State presented at his trial, the Petitioner has failed to meet his burden of clear and convincing evidence on any allegation, and, alternatively, has failed to establish that any deficient performance by [Counsel] would have potentially brought about a different result.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel. He contends that Counsel's advice to the Petitioner was deficient because the Petitioner did not fully understand the charges he faced, the available plea options, or the very favorable plea offer that was made to him. Counsel's deficient performance in this regard led the Petitioner to go to trial rather than enter a guilty plea. He additionally contends that Counsel failed to provide him with the recording of his confession before trial and failed to investigate the matter. Lastly, he contends that Counsel insufficiently questioned the victim about a

9

possible violation of the sequestration rule. The State responds that the Petitioner has not established any deficiency by Counsel or prejudiced suffered by the Petitioner. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

10

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner contends that Counsel was ineffective for failing to explain his sentencing exposure at trial, failing to provide a copy of the taped confession, failing to conduct a thorough investigation, and failing to litigate the alleged violation of the witness sequestration rule. The post-conviction court found that Counsel had fully explained to the Petitioner his charges and the potential punishments, and that both Counsel and Co-counsel made every effort to make the case and its liabilities clear to the Petitioner. The post-conviction court found that Counsel met with the Petitioner and prepared for trial including filing multiple motions prior to trial to keep certain items of evidence out of the trial. The post-conviction court found that the audio recording was not altered as alleged by the Petitioner and was provided to him prior to trial. Finally, the post-conviction court found that Counsel had cross-examined the victim to the extent feasible about the potential violation of the sequestration rule, and that she gave every indication it had not been violated.

The evidence does not preponderate against the post-conviction court's findings. Counsel testified that he was well prepared for trial and had met with the Petitioner numerous times. Counsel made every attempt to convince the Petitioner to accept the State's favorable plea offer but when the Petitioner ultimately rejected the offer, Counsel went ahead with his trial strategy. Counsel made several decisions during trial, including not to aggressively question the victim, based on his knowledge and experience with jury trials and minor victims. Such strategic or tactical decisions are given deference on appeal if the choices are informed and based upon adequate preparation. *See Goad*, 938 S.W.2d at 369; *see also, Hellard*, 629 S.W.2d at 9. Counsel and Co-counsel testified that the Petitioner had been provided with the recording of his confessions and neither saw any indication that it had been altered. Counsel stated that he had experience with altered recordings and so would recognize an alteration if one had occurred.

Regarding the violation of the witness sequestration rule, Counsel stated that he motioned for a mistrial, which was denied, and thus he questioned the victim as voraciously as was practical about the possibility that the rule had been violated and that the victim's testimony had been influenced. The victim denied that this had occurred and again, Counsel used his knowledge and experience in considering how much to push back on the victim's testimony. Again, we will not second guess such a strategic decision based on informed experience and adequate preparation. *Id.* Additionally, the Petitioner did not present any proof that Counsel's alleged deficient representation of him impacted the outcome of his trial. The State presented strong proof in the form of the victim's testimony, her taped forensic interview, and the Petitioner's taped confession. Accordingly, the Petitioner has failed to carry his burden that but for Counsel's performance, it is reasonably probable that the outcome of his proceedings would have been different. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE